**Opinion filed March 21, 2024**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-22-00039-CR & 11-22-00040-CR

_____

**JOEL LUNA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 70th District Court**
**Ector County, Texas**
**Trial Court Cause Nos. A-18-1666-CR & A-18-1665-CR**

### O P I N I O N

Appellant was convicted of aggravated assault with a deadly weapon and causing serious bodily injury to his wife, Trena Luna, a first-degree felony (trial court cause number A-18-1666-CR), and capital murder for causing the death of Trena's unborn child (trial court cause number A-18-1665-CR). *See* TEX. PENAL CODE ANN. §§ 1.07(a)(26), 19.02(b)(1), 19.03(a)(8), 22.02(b)(1) (West Supp. 2023). The cases were consolidated for trial. Because the State did not seek the death

penalty for the capital murder conviction, the trial court sentenced Appellant to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice without the possibility of parole. *See* PENAL § 12.31(a)(2) (West 2019); TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1(a) (West Supp. 2023). The jury assessed Appellant's punishment at thirty-six years' imprisonment for the aggravated-assault offense, and the trial court sentenced Appellant accordingly.

In six issues, Appellant challenges various evidentiary rulings regarding the trial court's admission of certain evidence, the trial court's refusal to submit Appellant's requested self-defense instruction, the definitions in the trial court's charge of the mental states that apply to the aggravated-assault offense, and the sufficiency of the evidence to support his conviction for capital murder.[1] We affirm in part, and we reverse and remand in part.

## I. *Factual Background*

Appellant and Trena were romantically involved for eighteen years. They met when they were both sixteen, married a few years later in November 2003, and had three children together. Appellant became physically violent about a year into their relationship; at the time, Trena was seventeen and pregnant with their oldest child. Appellant routinely "liked to choke [Trena]" during arguments that they had "[t]o get [her] to shut up," but Trena never reported the abuse to the police because she "felt like it was [her] fault."

---

[1]In each appeal, Appellant's first court-appointed appellate counsel submitted an *Anders* brief and filed a motion to withdraw. *See Anders v. California*, 386 U.S. 738 (1967). Following the procedures set forth in *Anders*, *Kelly v. State*, 436 S.W.3d 313 (Tex. Crim. App. 2014), and *In re Schulman*, 252 S.W.3d 403 (Tex. Crim. App. 2008), we independently reviewed the record and concluded that these appeals were not particularly amenable to disposition under *Anders*. We granted appellate counsel's motion to withdraw, abated these appeals, and remanded these causes to the trial court with instructions to appoint other appellate counsel. New appellate counsel was directed to file a brief on the merits in each appeal and address any substantive issues that appellate counsel deemed to be arguable. These appeals were reinstated after the trial court appointed new appellate counsel.

Trena and Appellant separated in January of 2018, after Trena became aware of Appellant's fourteen-year affair with her sister. They began dating other people, but decided to reconcile in April of 2018. Before Trena and Appellant resumed living together, Trena told Appellant that she might be pregnant with her former partner's child. At first, Appellant "didn't have much of a reaction," but did proclaim that "he was not going to raise another man's baby." Trena testified that two days after she and the children returned home, Appellant indicated that she needed to have an abortion.

Later that evening, in order "to celebrate getting back together," Appellant decided to treat Trena to a night on the town, which culminated with a visit to a local strip club where, among other things, Trena watched Appellant enjoy a lap dance; they argued, understandably, on the way home. When they pulled into the driveway around 2:00 or 3:00 a.m., Trena ran inside the house and locked the door because she "didn't want to be hurt." As Appellant climbed through their bedroom window, Trena yelled at him to "stay away" and announced that she and the children were leaving. Appellant, however, responded that no one was going anywhere.

Once Appellant was inside, Trena threw a variety of objects at him to keep him at a distance, knowing "he would hurt [her]" if he got close. Appellant caught Trena in the hallway, pushed her against the wall, and choked her. When he let her go, she went to the kitchen, grabbed some scissors, and held them out "[t]o keep distance between" her and Appellant. Trena retreated to their bedroom, where Appellant pinned her down on the bed, got on top of her, and choked her "to the point where [she] couldn't see anymore." Their oldest daughter, D.L., testified that she saw Appellant with both hands around Trena's neck, and heard her mother "gasping for air."

Just before Trena was about to lose consciousness, Appellant walked out of the bedroom, and began yelling to the children: "your mom is f-----g pregnant by

3

somebody else." The children did not know about Trena's pregnancy, so Trena ran after Appellant, and started "hitting him" and "shaking . . . his shoulders." Appellant then threw Trena down onto the hallway floor, knelt on her stomach, and pressed his bodyweight into her stomach.

Trena next remembered Appellant saying, "I'm going to kill that f-----g baby," and she felt like she "got the wind knocked out of [her] by some unimaginable force." She began and continued saying his name until he got off her. Trena described being in "excruciating pain . . . [r]ight below [her] rib cage in the center of [her] abdomen," where Appellant had been pressing with his knee. Appellant told her to get up, but she could not move, so he dragged her to their bedroom.

Trena told D.L. to call the police as Appellant dragged her past D.L.'s bedroom, but Appellant grabbed D.L.'s cell phone and yelled, "you're not calling the f-----g cops." Trena was unable to call for help; she was in "so much pain" and felt like she was dying. She described throwing up and crying all night; Appellant slept in the living room because her crying "agitated him." Trena threw up "green vomit" for the next two days, until Appellant finally left to go to work. When Appellant returned everyone's cell phones, D.L. called an ambulance, and Trena was transported to the hospital.

Chris Ackerman, the nurse practitioner who treated Trena, noticed "a red mark on the right side of her neck," which "appeared to be a thumbprint." Trena also had "multiple bruises" on her arms and legs and reported that her husband had "repetitively kicked and hit her." Concerned that Trena had sustained a serious abdomen injury, Ackerman ordered an ultrasound, which revealed "free fluid" in an area associated with abdominal bleeding, showed an injury to her pancreas, and confirmed her pregnancy.

Within thirty minutes after the ultrasound, Dr. Richard Wesley Ellison, a trauma and acute care surgeon with Medical Center Hospital in Odessa, began

4

performing "exploratory laparotomy" emergency surgery on Trena. Dr. Ellison observed that Trena's pancreas had been split in half, and that her injury "clearly had been present for well over 24 hours, because of all the inflammation." Dr. Ellison explained to the jury that "pancreas injuries are very rare," and Trena's injury would "have required a slow, constant pressure" to move the other organs "out of the way in order for her pancreas to get injured all by itself." Due to her pregnancy, Dr. Ellison "purposefully did everything [he] could to avoid" her pelvis and uterus during the surgery; however, Trena's unborn child did not survive. The severity of Trena's injury carried a "60 percent mortality risk" to her, and a "90 percent [chance] that she would lose [the unborn child]." It was the severity of her injury and its aftermath that, in Dr. Ellison's opinion, contributed to the loss of the fetus.

Appellant was indicted for (1) capital murder of an unborn child and (2) aggravated assault with a deadly weapon and causing serious bodily injury to a family or household member, or a person with whom Appellant has or had a dating relationship. At trial, the State presented the following witnesses: Trena, D.L., Ackerman, Dr. Ellison, Detective Mario Baeza with the Odessa Police Department, and Judy Drury, an expert on the subject of domestic violence and the dynamics of relationships that involve domestic violence.

Appellant testified and denied physically abusing Trena during their relationship and attested that he first learned about Trena's pregnancy "[m]aybe a day after [Trena] was admitted to the hospital."

With regard to the night in question, Appellant portrayed Trena as "screaming and yelling" at him as they drove home from the strip club but averred that he remained calm. Appellant testified that he walked into their home through the front door rather than by entering through the bedroom window, and he attempted to leave when their encounter began to escalate. However, when he went to his pickup, he realized that he had left his keys inside their home. He attempted to reenter their

5

home, but the front door was locked with the dead bolt. It was only then that he entered through the bedroom window, then went straight to the kitchen to retrieve his keys. According to Appellant, Trena was "yelling . . . hitting [him], throwing things at [him]," and she threw an eight-inch knife at him while he was in the kitchen, which struck him "between the eyes." Appellant testified that Trena then "pulled out the scissors" and said that "she was going to stab [him]"; Appellant claimed that he feared for his safety. Appellant was bleeding, so he then went to the bathroom to clean the wound that resulted from the knife striking him between his eyes. Trena followed him to the bathroom, and "[tried] attacking [him] again," so he "put her on the floor." At that point, Trena did not have a knife or any scissors in her hand.

Appellant admitted to grabbing Trena, getting her to the floor by trying to "lay her down," and putting his knee on her stomach for "about five, ten seconds." He testified that he was "[t]rying to calm her down," but "she was jumping, bucking, [he] guess[es] you could say." However, when Trena "finally . . . said that she was in pain," he "helped her up." Appellant claimed that he helped Trena to the bedroom, and they "laid down . . . [f]or the night."

Appellant likewise admitted to pinning Trena down on their bed "[p]rior to the . . . knife incident," but said he "never choked her." He also denied body slamming her, telling her that he was going to kill her baby, and preventing D.L. from calling 9-1-1.

The State offered several text messages, which the trial court admitted, that Appellant sent to Trena while she was hospitalized. In these texts, Appellant tells Trena that he is "sorry for everything," and "feel[s] bad." On cross-examination, Appellant acknowledged sending the messages and stated that he was just "being sympathetic."

6

## II. *Sufficiency of the Evidence*

Appellant argues in his fifth issue that the evidence is insufficient to support his conviction for capital murder. Based on this alleged evidentiary insufficiency, he argues in his sixth issue that the trial court's judgment should be reformed to show only a conviction for felony murder. *See* PENAL § 19.02(b)(3).

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* CRIM. PROC. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762 ("[A] reviewing court does not sit as a thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence."). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Garcia*, 667 S.W.3d at 761. Therefore, if the record supports conflicting inferences, we presume the factfinder

resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762.

We treat direct and circumstantial evidence equally under this standard. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Lee*, 676 S.W.3d at 915. Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, we may not use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Rather, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Appellant contends that the evidence is insufficient to support his conviction for capital murder because the State failed to prove that he "intended to kill the unborn child." Contrary to Appellant's contention, we conclude that the evidence adduced at trial is sufficient to support Appellant's conviction for capital murder.

A. *Analysis*

As charged in this case, a person commits the offense of capital murder if he intentionally or knowingly causes the death of an individual under ten years of age, which includes "an unborn child at every stage of gestation from fertilization until birth." PENAL §§ 1.07(a)(26), 19.02(b)(1), 19.03(a)(8). Appellant attacks the proof adduced at trial concerning his culpable mental state, arguing that he "denied knowing or having been told" about Trena's pregnancy.

8

"Intent and knowledge are fact questions for the jury, and are almost always proven through evidence of the circumstances surrounding the crime." *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring). A jury may infer intent and knowledge from any facts that tend to prove its existence, "including the acts, words, and conduct of the accused," the method the defendant uses to commit the offense, and "the nature of wounds inflicted on the victims." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique*, 994 S.W.2d at 649). Based on our review of the record, we conclude that a rational jury could have found beyond a reasonable doubt that Appellant intentionally or knowingly caused the death of Trena's unborn child.

Appellant admitted that he "put [his] knee on [Trena's] stomach," and he does not dispute that she was pregnant at the time of their encounter. He instead contests the jury's implicit finding that he knew about Trena's pregnancy. Trena testified that Appellant expressed his intent "to kill that f-----g baby" while he pressed his knee, with his entire bodyweight, into her abdomen. Trena also revealed that after their first two children were born, and before the birth of their third child, Appellant threatened to "punch [her] in the stomach and make sure [she] lost the baby" if she were to get pregnant again.

The medical evidence showed that Appellant crushed Trena's pancreas by putting slow, "significant pressure . . . down" on the lower portion of her body, which resulted in the death of her unborn child. According to Dr. Ellison, Trena's injury was consistent with her account that Appellant "drove [his] knee into her abdomen and held it there."

Ackerman corroborated Trena's testimony and repeated the statements that she made to him at the hospital that Appellant "grabbed her by the throat, and lifted her up off the ground, and [body] slammed her on the ground, and started jumping on her, and kicking her, and yelling at her that he was going to f-----g kill her." Trena

9

told Ackerman that two days before her admission, "her husband had come home, and she told him she was pregnant." Ackerman saw bruises on Trena's arms and legs, a thumbprint-shaped mark on Trena's neck, and observed that "she jumped and [was] guarded" when he tried to touch her abdomen.

The jury could infer from the violent nature of Appellant's behavior, the testimony about Trena's injuries, the photographs that depicted her injuries, and the resulting loss of her unborn child that Appellant intended to kill Trena's unborn child. *See Hart*, 89 S.W.3d at 64; *see also Pence v. State*, No. 05-22-00637-CR, 2023 WL 5089276, at *4 (Tex. App.—Dallas Aug. 9, 2023, pet. ref'd) (mem. op., not designated for publication). Given Appellant's express intent to "kill that f-----g baby," the manner in which Appellant committed the offense, and the injuries he inflicted on a much smaller, weaker victim, a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant attacked Trena with the intent to cause the death of her unborn child, and that he knew kneeling on her stomach with his body weight and with such force would kill or was reasonably certain to result in the death of her unborn child. *See* PENAL § 6.03(a)–(b) (West 2021). Accordingly, we overrule Appellant's fifth issue.

In his sixth issue, Appellant asks, "[w]as the evidence sufficient to prove [Appellant] committed the crime of [c]apital [m]urder . . . or should [we] reform the judgment to reflect a conviction" for felony murder?" Because we have concluded that the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of capital murder of Trena's unborn child as charged in the indictment, we need not address Appellant's complaint, or request, that the trial court's judgment should be reformed to show a conviction for felony murder. Accordingly, we overrule Appellant's sixth issue. *See* TEX. R. APP. P. 47.1.

### III. *Expert Testimony*

Appellant asserts in his first issue that Judy Drury's expert testimony was "a waste of the jury's time[,] which amounted to improper bolstering of [Trena]'s testimony before [Trena] had even taken the witness stand." We construe Appellant's briefing as an argument that the trial court erroneously admitted Drury's testimony because it was irrelevant, unfairly prejudicial, and unreliable. *See* TEX. R. EVID. 401–403, 613, 702–705.

#### A. *Evidentiary Standard of Review*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). This standard also applies to a trial court's decision to admit or exclude extraneous-offense evidence. *Perkins v. State*, 664 S.W.3d 209, 216–17 (Tex. Crim. App. 2022); *Arevalo v. State*, 675 S.W.3d 833, 843 (Tex. App.—Eastland 2023, no pet.). The trial court's decision will be upheld as long as it was within the "zone of reasonable disagreement." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Further, we will not reverse a trial court's evidentiary ruling, even if the trial court's reasoning is flawed, if it is correct on any theory of law that finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016).

#### B. *Rules 702, 703, & 705 of the Texas Rules of Evidence*

An expert witness that is qualified as such by "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Any and all scientific testimony or evidence must be both relevant and reliable as a precondition to admissibility. *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim. App. 2020) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993);

11

*Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App. 1992)). The admissibility of scientific evidence, and thus its relevance and reliability, is determined by the trial court in its function as the gatekeeper. *Id.* A trial court's admission of expert testimony will rarely be disturbed on appeal because "the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 & n.9 (Tex. Crim. App. 2006).

"[T]he proponent of scientific evidence must show by clear and convincing proof that the proffered evidence is sufficiently reliable and relevant to assist the jury in accurately understanding other evidence or in determining a fact in issue." *Wells*, 611 S.W.3d at 426 (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)). Because the Rule 702 inquiry is case-specific and fact-intensive, the reliability determination is flexible and the trial court as the gatekeeper must determine how to assess the reliability of particular testimony. *Id.*

"*Nenno* set forth a framework for evaluating the reliability of expert testimony in fields of study outside the hard sciences." *Rhomer*, 569 S.W.3d at 671; *see Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). Thus, when assessing expert testimony in the "soft science" fields of behavior and psychology, courts evaluate the reliability of such testimony by relying on the following factors: "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Nenno*, 970 S.W.2d at 561.

"[R]eliability should be evaluated by reference to the standards applicable to the particular professional field in question." *Coble v. State*, 330 S.W.3d 253, 274

(Tex. Crim. App. 2010). Pertinent to the issues before us, Texas courts have recognized that jurors generally may not be familiar with the typical behavior of family violence victims and have thus concluded that expert testimony about the dynamics of domestic violence is admissible under Rule 702. *See Kingsbury v. State*, 625 S.W.3d 686, 692 (Tex. App.—Fort Worth 2021, no pet.); *Brewer v. State*, 370 S.W.3d 471, 474 (Tex. App.—Amarillo 2012, no pet.); *see also Foster v. State*, No. 01-17-00537-CR, 2018 WL 1914871, at *5 (Tex. App.—Houston [1st Dist.] Apr. 24, 2018, pet. ref'd) (mem. op., not designated for publication).

1. *Relevance*

First, we determine whether the trial court abused its discretion when it found that Drury's testimony was relevant. "Relevance is 'a looser notion than reliability' and is 'a simpler, more straight-forward matter to establish.'" *Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011) (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). "Courts have specifically permitted the use of expert testimony on the cycle of family violence and its dynamics of power and control to help juries understand a victim's delay, reluctance, and inconsistencies in reporting abuse as well as other behavior, including recanting a report of abuse, consistent with that of family violence victims." *Davis v. State*, No. 05-19-00625-CR, 2020 WL 5015276, at *8 (Tex. App.—Dallas Aug. 25, 2020, no pet.) (mem. op., not designated for publication).[2]

---

[2]*See also Brewer*, 370 S.W.3d at 474 (upholding the trial court's admission of general expert testimony on the domestic violence cycle to assist the jury in understanding the victim's delay in calling the police); *Young v. State*, No. 09-17-00374-CR, 2019 WL 1647679, at *2 (Tex. App.—Beaumont Apr. 17, 2019, no pet.) (mem. op., not designated for publication) (holding that testimony about the cycle of violence was admissible to explain text messages in which the defendant apologized for his violent actions and the complainant expressed forgiveness and a desire to maintain their relationship and drop criminal charges); *Lessner v. State*, No. 02-15-00400-CR, 2016 WL 4473263, at *3-6 (Tex. App.—Fort Worth Aug. 25, 2016, no pet.) (per curiam) (mem. op., not designated for publication) (upholding the admission of expert testimony about the dynamics of family violence and the typical behavior of victims in relation to their abusers to explain a victim's recanting testimony); *Mendoza v. State*, No. 08-13-00293-CR, 2015 WL 5999596, at *4-5 (Tex. App.—El Paso Oct. 14, 2015, pet. ref'd) (not designated for publication) (holding

We conclude that Drury's expert testimony was relevant and probative to explain the behavioral characteristics of family violence victims in general. Trena testified that Appellant did not apologize after he physically abused her. In fact, Trena was "the one who apologized for getting him upset and to that point." She also "learned to shut up after a while and just sort of keep everything inside as best as [she] could." Trena never called the police because she "felt like it was [her] fault," and "felt guilty for telling anybody what [Appellant] did." After Appellant was arrested, Trena continued communicating with him because, after being with Appellant for eighteen years, she "didn't learn until after this relationship that love is not supposed to hurt." Trena admitted that she did not understand at the time that "what happened wasn't okay," and was not "normal," "daily[,] ongoing behavior in relationships."

Consistent with Drury's explanation of the "honeymoon phase," Appellant apologized to Trena several days after she was hospitalized and prior to his arrest. He promised her that he would work normal hours so he could be with her more and "take care of [her]." And while Appellant was confined in the Ector County jail awaiting trial, he asked Trena "to fill out an affidavit," swearing that she "had not told the truth initially," in an attempt to have his charges dismissed.

For the aforementioned reasons, Drury's testimony was helpful to the jury in understanding Appellant's promises, apologies, and Trena's subsequent behavior as a victim of domestic violence. That Drury did not research this particular case, its

---

that testimony regarding the cycle of family violence was relevant when the assault was witnessed by a third party but the victim refused to cooperate with police and testified for the defense); *Capello v. State*, No. 03-05-00553-CR, 2006 WL 2453021, at *4 (Tex. App.—Austin Aug. 25, 2006, pet. ref'd) (mem. op., not designated for publication) (upholding the trial court's admission of expert testimony on the cycle of domestic abuse because it assisted the jury in understanding why the victim initially lied to the police); *Scugoza v. State*, 949 S.W.2d 360, 363 (Tex. App.—San Antonio 1997, no pet.) (allowing a witness to testify about general domestic violence behaviors, including that recantation of an initial accusation was consistent with the behavior of the typical battered woman, despite having no personal knowledge of the defendant and the victim).

facts, or have any interaction with or knowledge of Trena or Appellant does not detract from her testimony's probative value. *See* Tex. R. Evid. 703; *Lessner*, 2016 WL 4473263, at *3. Therefore, we conclude that the trial court did not abuse its discretion when it determined that Drury's expert testimony was relevant.

### 2. *Reliability*

Drury is a licensed professional counselor and program director at Safe Place of the Permian Basin; she has been a victim's advocate and liaison for over twenty years through Safe Place. As a family violence therapist, she has special training in domestic violence, trauma, and abuse, in addition to her bachelor's degree in psychology and her master's degree in counseling. Her expertise is in the subject of domestic violence, and the dynamics of relationships involving domestic violence.

Drury testified about "[d]omestic violence in general," "the dynamics of family violence," and "[t]he effects on victims." She explained that domestic violence "is a pattern of assaultive and coercive behaviors" exerted by one intimate partner over another, including "psychological, physical, sexual," and "financial" control. She testified that "[i]t's about power and control," and that the "cycle of violence" in relationships can generally be divided into three phases—"the tension[-]building phase," then the emotional, verbal, or physical assault phase, and finally "the honeymoon phase" or "the calm" when the aggressor has realized that he or she has "gone too far." During the honeymoon phase, the abuser makes promises, sometimes provides gifts, and "many times they go [sic] back together."

We recognize that witnesses from a variety of backgrounds have been permitted to testify as experts regarding family or domestic violence.[3] We are

---

[3]*See, e.g.*, *Brewer*, 370 S.W.3d at 474 (allowing a counselor in the family violence section of a police department to provide expert testimony regarding the three-stage cycle of violence); *Dixon v. State*, 244 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (holding that a police officer was qualified to express an expert opinion as to the behavior of victims of family violence); *Coker v. State*, No. 05-17-00782-CR, 2019 WL 3406629, at *2 (Tex. App.—Dallas July 29, 2019, no pet.) (mem. op., not designated for publication) (permitting a counselor and a social worker at a women's shelter to testify about

aligned with our sister courts in holding that domestic violence, as an area within the field of psychology, is a legitimate field of expertise. *See infra* note 3. Based on Drury's background, experience, reliance on accepted principles, and knowledge in the area of domestic violence, we conclude that the trial court did not abuse its discretion when it found that Drury's expert testimony was reliable. *See Nenno*, 970 S.W.2d at 561–62.

C. *Rule 403 and the Balancing Factors*

We next turn to Appellant's argument that Drury's testimony should have been excluded under Rule 403 of the Texas Rules of Evidence. "Generally, all relevant evidence is admissible." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (citing TEX. R. EVID. 402). "Evidence is relevant if it tends to make a fact 'of consequence in determining the action' more or less probable than it would be otherwise." *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021) (citing TEX. R. EVID. 401).

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Hall v. State*, 663 S.W.3d 15, 34 (Tex. Crim. App. 2021); *Arevalo*, 675 S.W.3d at 851; *Walter v. State*, 581 S.W.3d 957, 978 (Tex. App.—Eastland 2019, pet. ref'd) (quoting *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002)). However, Rule 403 also provides that relevant evidence may nonetheless be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." TEX. R. EVID. 403.

the cycle of violence); *Runels v. State*, No. 03-18-00036-CR, 2018 WL 6381537, at *6 (Tex. App.—Austin Dec. 6, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that a counselor's testimony based on concepts of the cycle of violence and the power and control wheel was sufficiently reliable to allow the counselor to testify as an expert); *Nwaiwu v. State*, No. 02-17-00053-CR, 2018 WL 3763899, at *2–4 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that testimony from a licensed marriage and family therapist, including portions explaining the power and control wheel, was admissible); *Booker v. State*, No. 05-08-00699-CR, 2009 WL 2006428, at *6 (Tex. App.—Dallas July 13, 2009, no pet.) (not designated for publication) (holding that the victim services coordinator at a police department qualified as an expert witness in the field of domestic violence).

So even if a trial court determines that evidence is relevant and admissible for a non-conformity purpose, Rule 403 may still preclude its admission if the probative value of the evidence is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403; *Perkins*, 664 S.W.3d at 216. When conducting a Rule 403 analysis, a trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest [a] decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Hall*, 663 S.W.3d at 32 (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)); *Roe v. State*, 660 S.W.3d 775, 784 (Tex. App.—Eastland 2023, pet. ref'd.).

The first *Gigliobianco* factor focuses on the inherent probative force of the proffered evidence. "Probative value" refers "to how strongly an item of evidence 'serves to make more or less probable the existence of a fact of consequence to the litigation[,] coupled with the proponent's need for that item of evidence.'" *Roe*, 660 S.W.3d at 784–85 (quoting *Gigliobianco*, 210 S.W.3d at 641).

We have already concluded that Drury's testimony was relevant. We further conclude that its inherent probative force served to explain the dynamics of domestic violence to the jury who might not readily understand it. With respect to the State's need for the evidence (the second factor), the State's case pitted Trena's version of events against Appellant's denials and his characterization of Trena as the aggressor. Drury's expertise provided a helpful framework for the jury in assessing credibility,

understanding Trena's behavior throughout her eighteen-year relationship with Appellant, and resolving any inconsistencies in the testimony. *See, e.g.*, *Foster*, 2018 WL 1914871, at *6.

The third and fourth *Gigliobianco* factors focus on the tendency of the evidence to suggest a decision on an improper basis, the potential to confuse or distract the jury from the main issues, and the potential to mislead the jury. *Roe*, 660 S.W.3d at 785. "Unfair prejudice refers to the evidence's 'tendency to tempt the jury into finding [the defendant] guilt[y] on grounds apart from proof of the offense charged.'" *Perkins*, 664 S.W.3d at 216 (quoting *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005)). Indeed, all evidence that is presented against a defendant is designed to be prejudicial; however, Rule 403 is not concerned with prejudicial evidence, but rather with evidence that is *unfairly* prejudicial. TEX. R. EVID. 403; *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013).

Drury's testimony had minimal potential for unfair prejudice. Her description of the cycle of violence and a victim's behavioral characteristics naturally assumed the presence of abuse in relationships that involve domestic violence but did not suggest a decision on an irrational basis. And although her testimony may have tended to make Trena's testimony regarding her behavior prior to and following the assault more plausible, it is well-settled that otherwise admissible substantive evidence should not be excluded for mere injury to an appellant's case. *See Pawlak*, 420 S.W.3d at 811.

The fourth factor also requires an assessment of the challenged evidence's potential to confuse or distract the jury; the fifth factor focuses on its potential to mislead the jury. *Gigliobianco*, 210 S.W.3d at 641–42. Here, there was little risk of confusion and no potential to mislead the jury. Drury's general testimony—which she made clear was not based upon any knowledge of the victim or the relationship between Trena and Appellant—was no more likely to suggest that Appellant was an

18

abuser in general than the other fact-specific testimony that was presented from Trena's treating medical personnel, law enforcement, D.L., and Trena.

As for the sixth *Gigliobianco* factor—the time needed to present the evidence, and whether it is cumulative of other evidence—the challenged testimony was brief. The State presented six witnesses over the course of two days. In the record, Drury's testimony consists of twenty-two pages of the State's roughly 180-page case-in-chief. As Drury's testimony consisted of only a small portion of trial, it can hardly be deemed to be excessive. *See Rodriguez v. State*, 678 S.W.3d 375, 387 (Tex. App.—Dallas 2023, pet. ref'd). Considering the foregoing, we conclude that the trial court did not abuse its discretion when it admitted Drury's testimony over Appellant's Rule 403 objection.

D. *Bolstering*

Appellant also asserts that Drury's testimony "amounted to improper bolstering" of Trena's testimony. "Bolstering" existed before the Texas Rules of Evidence were adopted, and the term itself failed to survive the adoption. *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009). The Court of Criminal Appeals has defined "bolstering" as evidence for which the *sole* purpose is to "convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing 'to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'" *Id.* (quoting *Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993)). Rule 613(c) of the Texas Rules of Evidence "seems to be covered under the 'bolstering' objection 'to the extent it prevents the use of prior consistent statements of a witness for the sole purpose of enhancing his credibility.'" *Id.* (quoting *Cohn*, 849 S.W.2d at 820 n.8). "Rule 613(c) makes inadmissible any prior consistent statement of a witness which is consistent with the [witness's] testimony, except as provided by Rule 801(e)(1)(B)." *Id.* at 886–87.

19

In support of his argument, Appellant cites *Duckett v. State*, 797 S.W.2d 906 (Tex. Crim. App. 1990). Three years after *Duckett*, the Court of Criminal Appeals in *Cohn* reconsidered its holding regarding the propriety of the "bolstering" objection:

> We frankly admit that our opinion in *Duckett* may be read to hold that even expert testimony that is relevant as substantive evidence may yet be inadmissible unless it serves some rehabilitative function. *Duckett* seems to suggest that the source for such a rule may be found in Rule 403. To the extent *Duckett* may be so read, however, we now disapprove it.

849 S.W.2d at 819 (internal citations omitted). Rather, "the key to admissibility remains the same [in] these cases: the expert witness must be qualified in their field, use tools and methods from their field, draw conclusions based on those qualifications and methods, and not comment on victim credibility." *Moreno v. State*, 619 S.W.3d 754, 762 (Tex. App—San Antonio 2020, no pet.).

An expert's testimony based on specialized knowledge, relevant data, and that does not directly comment on credibility is unlikely to meet the threshold of undue prejudice, even if it may corroborate the victim's testimony and weigh against the defendant. *Id.* (citing *Yount v. State*, 872 S.W.2d 706, 712 n.9 (Tex. Crim. App. 1993)). For these reasons, and because of Drury's lack of knowledge of the specific facts of this case, we find no merit in Appellant's "bolstering" complaint. Accordingly, and because we conclude that the trial court did not abuse its discretion when it admitted Drury's expert testimony, we overrule Appellant's first issue.

## IV. *Admission of Extraneous Offenses*

In his second issue, Appellant challenges the trial court's admission of Appellant's extraneous acts. Appellant's heading in his brief for this issue asks: "Did the Trial Court abuse its discretion and commit reversible error when it permitted the State to introduce improper extraneous-offense evidence pursuant to

Texas Code of Criminal Procedure, Article 38.371 in violation of Texas Rules of Evidence 403 and 404(b)?" Then, to our confusion,[4] he cites Article 37.07, Section 3(g), which pertains to extraneous offenses introduced during the punishment phase of trial. *See* CRIM. PROC. art. 37.07, § 3(a)(1) ("evidence may be offered . . . as to any matter the court deems relevant to *sentencing*, including but not limited to the prior criminal record of the defendant . . . and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt." (emphasis added)). Appellant cites to several case excerpts that expound on the notice requirements of Article 37.07, Section 3(g), but he makes no further mention of Article 38.371.

Although we liberally construe briefs in the interest of justice, we are unable to discern the specific arguments raised by Appellant, and we will not brief his case for him. *See Lagrone v. State*, 942 S.W.2d 602, 614 (Tex. Crim. App. 1997), *cert. denied*, 522 U.S. 917 (1997) ("Without substantive argument or supporting authorities, we cannot adequately evaluate appellant's ineffective assistance claim."); *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995) ("Appellant cites no authority in support of his proposition, nor does he provide any argument beyond his conclusory assertion."); *Edmondson v. State*, 399 S.W.3d 607, 612 (Tex. App.—Eastland 2013, no pet.) (finding that the appellant waived his complaint because he failed "to show that the record and the law support[ed] his argument").

Moreover, Appellant presents no argument, discussion, analysis, or authoritative citations that assert or support any contention on appeal that he was harmed by the trial court's admission of the complained-of extraneous-offense evidence. Therefore, irrespective of having raised the issue, the omission of any

---

[4]The State offered no evidence during the punishment phase, therefore Article 37.07, Section 3(g) is inapplicable.

substantive analysis of the harm that Appellant allegedly suffered renders the issue waived. *See* TEX. R. APP. P. 38.1(i); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (the failure to brief whether alleged error caused harm waived the issue on appeal); *Arevalo*, 675 S.W.3d at 847 (same).

Insofar as Appellant attempts to argue that the trial court erroneously admitted evidence of his extraneous acts during the guilt/innocence phase of trial, we conclude that this issue is inadequately briefed. *See* TEX. R. APP. P. 38.1(i). With respect to Appellant's argument that the trial court erroneously admitted extraneous-offense evidence under Article 37.07 during the punishment phase, we note that the State introduced no such evidence during the punishment phase. Accordingly, because Appellant's argument is indiscernible, and inapplicable from what we can construe, we could overrule his second issue on that ground alone.

Nevertheless, Appellant further argues that the trial court erroneously admitted evidence of extraneous acts that he committed against Trena throughout their relationship, citing to Rules 403 and 404(b).[5] Trena testified that Appellant:

- knocked her over and kicked her in the stomach while she was pregnant with their oldest child;

- would get physically violent with her when they argued, and liked to choke her;

- choked her while they were living in Alice, Texas "[t]o get [her] to shut up";

- "punched [her] so hard in the side of the head" that she "fell to the floor";

- told her after their second child was born that "if [she] ever got pregnant that he would punch [her] in the stomach and make sure [she] lost the baby";

- while living in Corpus Christi, he chased her and tackled her after she jumped out of their car during an argument; and

---

[5]Appellant also asserts that the evidence was admitted in violation of Article 37.07, Section 3(g) of the Code of Criminal Procedure. Because that Article pertains to evidence that is offered "at sentencing," and because the State offered no such evidence during the punishment phase, that Article does not apply here. *See* CRIM. PROC. art. 37.07, § 3(a)(1).

• had an affair with her sister.

Although Appellant objected to Trena's testimony under Rules 402 and 403 of the Texas Rules of Evidence, at no time prior to or during trial did Appellant object to the admission of extraneous-offense evidence under Rule 404(b). Because Appellant did not state the grounds for his objection "with sufficient specificity to make the trial court aware of the complaint," and because his complaint on appeal does not comport with the objection that he made at trial, he did not preserve his Rule 404(b) complaint for our review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Arevalo*, 675 S.W.3d at 845 ("an objection asserted at trial on one ground cannot support a different contention on appeal"); *see also Edmondson*, 399 S.W.3d at 611. Even so, the complained-of evidence was introduced to show the relationship between Trena and Appellant—a non-character-conformity purpose.

### A. *Admission of Evidence under Article 38.371*

Article 38.371 permits each party to offer "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense" for which the defendant is on trial, if the alleged victim is a current or former member of the defendant's family or household, or a person with whom the defendant had or did have a dating relationship. CRIM. PROC. art. 38.371; *see* TEX. FAM. CODE ANN. §§ 71.0021(b), 71.003, 71.005 (West 2019).

The nature of the relationship—such as whether the victim and the accused were married, estranged, separated, or divorced—is "clearly admissible under this Article." *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006). Further, prior acts of violence between the victim and the accused may be offered to illustrate the nature of the relationship. *Id.* For example, extraneous-offense evidence held to be admissible under Article 38.371 has included proof that: (1) explains why a complainant of domestic violence is unwilling to cooperate with the prosecution; (2) confirms the victim's initial—and later recanted—statements to police; or

23

(3) contextualizes the nature of the relationship between the complainant and the assailant. *Rodriguez*, 678 S.W.3d at 386.

Trena's testimony regarding Appellant's past abuse and aggressive behavior provided the jury with important insight into the nature of their violent and volatile relationship. *See, e.g.*, *Baxter v. State*, No. 02-22-00258-CR, 2023 WL 8268292, at *9 (Tex. App.—Fort Worth Nov. 30, 2023, pet. ref'd) (mem. op., not designated for publication). The extraneous-offense evidence was also relevant to Appellant's intent, and absence of mistake, or lack of accident. *See* TEX. R. EVID. 404(b); *Baxter*, 2023 WL 8268292, at *9. Therefore, we conclude the trial court did not abuse its discretion when it admitted evidence of the extraneous acts referenced above under Article 38.371 and Rule 404.

B. *Rule 403 and the Balancing Factors*

Evidence proffered under Article 38.371 is "subject to the Texas Rules of Evidence," including Rule 403. *See* CRIM PROC. art. 38.371(b). Appellant argues that the complained-of extraneous-offense evidence was admitted in violation of Rule 403 because "[t]he extraneous offenses occurred, if they occurred at all, some [twelve] to [seventeen] years before the offense." He points to the "time lapse" and the lack of the State's need for the evidence as requiring a reversal of the trial court's ruling. Upon balancing the *Gigliobianco* factors, we conclude that the trial court did not abuse its discretion when it admitted the complained-of extraneous-offense evidence.

As for the first *Gigliobianco* factor, the trial court could have reasonably concluded that the State had a significant need for this probative evidence. *See Gigliobianco*, 210 S.W.3d at 641–42. Contrary to Appellant's assertions, the challenged extraneous acts that show Appellant's years of domestic abuse against Trena assisted the jury by (1) illustrating Appellant's motives, (2) shedding light on the relationship's dynamics, (3) establishing identity, or (4) emphasizing the true

24

version of events when Trena considered recanting. *See Rodriguez*, 678 S.W.3d at 386–87. Trena testified about past instances of domestic violence, Appellant's controlling demeanor, and her fear of him, which aided in the jury's perception of their violent and volatile relationship and provided the necessary context. *See Baxter*, 2023 WL 8268292, at *8–9.

The extraneous offenses also informed the jury's assessment of Appellant's credibility. Appellant testified that he was calm during their night "on the town," and on the way home, even while Trena was screaming and yelling. Appellant's version of events characterized Trena as the aggressor. The evidence of his past abuse was thus necessary to support the State's theory—and the jury's ultimate conclusion—that Appellant was the aggressor throughout their relationship, including when he committed the charged offenses. Appellant's years of domestic abuse, such as punching, kicking, and choking Trena, accompanied by his psychological abuse, further demonstrated why Trena continued in her efforts to reconcile, and provided additional evidence of Appellant's motives and identity. *See Rodriguez*, 678 S.W.3d at 387. Therefore, the probative value of the extraneous-offense evidence was strong.

Although the State presented other favorable evidence, no one, other than Trena, witnessed Appellant put his knee on Trena's stomach and lean on her until he split her pancreas, which ultimately caused the death of her unborn child. *See James v. State*, 623 S.W.3d 533, 548 (Tex. App.—Fort Worth 2021, no pet.) ("In the absence of any witnesses to the charged offenses, the extraneous-offense evidence rebutted the [appellant's] fabrication defense and supported the State's allegations that [the appellant] was responsible for" committing the charged acts.). Appellant challenged Trena's credibility, but evidence of his prior assaults and abusive conduct against her tended to make it less likely that a complainant fabricated the charged

25

offenses. *See id.* Thus, the first two *Gigliobianco* factors weigh in favor of admission.

As we have said, the third and fourth *Gigliobianco* factors focus on the tendency of the evidence to suggest a decision on an improper basis, the potential to confuse or distract the jury from the main issues, and the potential to mislead the jury. *Roe*, 660 S.W.3d at 785. "Unfair prejudice refers to the evidence's 'tendency to tempt the jury into finding [the defendant] guilt[y] on grounds apart from proof of the offense charged.'" *Perkins*, 664 S.W.3d at 216 (quoting *Mechler*, 153 S.W.3d at 440). Further, all evidence that is presented against a defendant is designed to be prejudicial—Rule 403 is concerned not with prejudicial evidence, but with evidence that is *unfairly* prejudicial. TEX. R. EVID. 403; *Pawlak*, 420 S.W.3d at 811.

We first note that the challenged acts were no more heinous than the charged offense. *See James*, 623 S.W.3d at 549–550. The magnitude of Appellant's past conduct—tackling Trena, kicking her, choking her, and giving her a concussion—renders the danger of unfair prejudice minimal when compared to his conduct in splitting her pancreas in half and killing her unborn child. *See Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd). Additionally, any tendency to draw impermissible inferences of character conformity "can be minimized through a limiting instruction," which the trial court gave in this case. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996). Here, because the trial court took measures and instructed the jury not to consider the admitted extraneous-offense evidence for any improper purpose, which mitigated the potential for any improper influence of the challenged evidence or harm to Appellant, we presume that the jury obeyed the trial court's instruction. *See Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003); *Roe*, 660 S.W.3d at 785; *see also Arevalo*, 675 S.W.3d at 851; *Wishert v. State*, 654 S.W.3d 317, 334 (Tex. App.—Eastland 2022, pet. ref'd).

The fourth factor requires an assessment of the challenged evidence's potential to confuse or distract the jury, and the fifth factor focuses on its potential to mislead the jury. *Gigliobianco*, 210 S.W.3d at 641–42. Here, there was little risk of jury confusion, as the extraneous-offense evidence was not scientific in nature, nor was it overly complex. *See James*, 623 S.W.3d at 550; *see also Baxter*, 2023 WL 8268292, at *12. Moreover, because Trena was a lay witness who described the acts in a factual, straightforward manner, the jury was equipped to evaluate the probative force of the evidence. Therefore, we conclude that the third, fourth, and fifth *Gigliobianco* factors weigh in favor of admission.

As for the sixth *Gigliobianco* factor—the time needed to present the evidence, and whether it is cumulative of other evidence—the State only briefly presented evidence of the extraneous acts. The State's case-in-chief was comprised of six witnesses that were presented over the course of two days. Trena's testimony encompasses eighty-five pages of the record. The extraneous acts were developed in thirteen of those pages, not all of which were devoted to the challenged evidence. This small fraction of the roughly 180-page record of the State's case-in-chief took a comparatively short amount of time to present and it was not cumulative of other evidence presented. *See Rodriguez*, 678 S.W.3d at 387.

While the extraneous-offense evidence could be perceived as prejudicial, "Rule 403 contemplates excluding evidence only when there is a 'clear disparity' between the offered evidence's prejudice and its probative value." *Roe*, 660 S.W.3d at 785 (quoting *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009)). Applying the applicable standard of review, which we must, the presumption favoring the admissibility of relevant evidence, and the *Gigliobianco* factors, we conclude that the trial court did not abuse its discretion when it admitted the challenged relationship evidence. *See Hammer*, 296 S.W.3d at 568 ("Because Rule 403 permits the exclusion of admittedly probative evidence, it is a remedy that

27

should be used sparingly, especially in 'he said, she said' . . . cases that must be resolved solely on the basis of the testimony of the complainant and the defendant." (footnote omitted)). Accordingly, and for the reasons discussed above, we overrule Appellant's second issue.

V. *Definitions of the Culpable Mental States*

In his fourth issue, Appellant contends that the trial court failed to fully instruct the jury on the complete definitions of the mental states that apply to the aggravated-assault offense: intentionally, knowingly, and recklessly.

The Penal Code defines four separate culpable mental states—intentionally, knowingly, recklessly, and criminally negligent. *See* PENAL § 6.03. "'[T]he scope of those culpable mental states is limited by the type of offense,' which depends on the 'conduct element.'" *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022) (quoting *Cook v. State*, 884 S.W.2d 485, 487 (Tex. Crim. App. 1994)). "There are three 'conduct elements:' (1) nature of [the] conduct; (2) result of [the] conduct; and (3) the circumstances surrounding the conduct." *Id.* A trial court errs when it fails to limit in its charge the definitions of the applicable culpable mental state(s) to the conduct element or elements of the offense to which they apply. *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015); *Cook*, 884 S.W.2d at 491.

Appellant was charged with committing aggravated assault against Trena by causing her serious bodily injury, and by using a deadly weapon. *See* PENAL § 22.02(b)(1)(A). Aggravated assault, when defined by causing serious bodily injury, is a "result-oriented" offense. *Hernandez v. State*, 556 S.W.3d 308, 327 (Tex. Crim. App. 2017) (op. on reh'g); *Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012). Here, the trial court's charge defined the three applicable mental states as follows:

> A person acts intentionally, or with intent, with respect to a *result* of his conduct when it is his conscious desire to cause the result.

28

A person acts knowingly, or with knowledge, with respect to a *result* of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person acts recklessly, or is reckless, with respect to the *result* of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances, as viewed from the actor's standpoint.

*Cf.* PENAL § 6.03(a)–(c) (emphasis added). Because the definitions submitted in the trial court's charge are properly limited to the applicable "result-of-conduct" elements of the charged offense, the trial court did not err as Appellant suggests. Accordingly, we overrule Appellant's fourth issue.

## VI. *The Omission of the Self-Defense Instruction*

Finally, Appellant contends in his third issue that the trial court erroneously denied his requested self-defense instruction with respect to the aggravated-assault offense.[6]

### A. *Standard of Review*

Reviewing claims of charge error is a two-step process. *Campbell*, 664 S.W.3d at 245 (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). First, we must determine whether error exists. *Id.* Second, if there is error, we must decide whether the appellant was harmed and if the harm is sufficient to warrant

---

[6]Appellant argues on appeal that he was entitled to a self-defense instruction; however, in support of his argument he only cites to Section 9.31(a)(1)(B). At trial, Appellant submitted a written request for a self-defense instruction under Section 9.32, which would have permitted the jury to acquit him upon finding that his use of deadly force was justified. Appellant does not contest that he split Trena's pancreas in half by pressing his knee onto her abdomen, thereby causing her serious bodily injury. Because Appellant indisputably used deadly force, the jury would have been required to find that he was justified in doing so to acquit him. *See* PENAL §§ 9.01(3), 9.32. Hence, a non-deadly force instruction under Section 9.31(a) is inapplicable, and the trial court did not err in refusing to give one. *See Ferrel v. State*, 55 S.W.3d 586, 592 (Tex. Crim. App. 2001). Given the import of this issue and the endeavors by Appellant's trial counsel to preserve this issue for our review, we afford Appellant a liberal construction of his briefing and assume that he intended to argue that the trial court erroneously denied his requested deadly-force self-defense instruction, as that is the applicable law in this case.

reversal. *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022) (citing *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013)); *Ybarra v. State*, 621 S.W.3d 371, 384 (Tex. App.—Eastland 2021, pet. ref'd). The applicable standard of review to be utilized for charge error depends on whether the claimed error was preserved. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020).

The purpose of the trial court's charge "is to inform the jury of the applicable law and guide them in its application to the case." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007) (quoting *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)). Charge error stems from the denial of a defendant's right to have the trial court provide the jury with instructions that correctly set forth the "law applicable to the case." *Bell v. State*, 635 S.W.3d 641, 645 (Tex. Crim. App. 2021) (quoting CRIM. PROC. art. 36.14). Because the trial court is obligated to correctly instruct the jury on the law applicable to the case, it is ultimately responsible for the accuracy of its charge and the accompanying instructions. *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (citing *Delgado*, 235 S.W.3d at 249). Therefore, when the charge is inaccurate, the trial court errs, and the error is subject to the appropriate harm analysis. *See Bell*, 635 S.W.3d at 645.

When, as in this case, charge error is preserved at trial, we must reverse if the error caused "some harm." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). "Some harm" means actual harm and not merely a theoretical complaint. *Sanchez v. State*, 376 S.W.3d 767, 774–75 (Tex. Crim. App. 2012). To determine whether the charge error harmed the defendant, we examine and consider, in light of the entire charge, the evidence presented at trial, including the contested issues and the weight of the probative evidence, the arguments of counsel, and any other relevant information in the trial record as a whole that informs our analysis. *Id.* (citing *Almanza*, 686 S.W.2d at 171). In examining the evidence, we must consider

"the plausibility of the evidence raising the defense." *Villarreal v. State*, 453 S.W.3d 429, 436 (Tex. Crim. App. 2015). These factors guide our analysis. *Id.* at 433. There is no burden of proof associated with the harm evaluation; reversal is required if the error was calculated to injure the defendant's rights. *Reeves*, 420 S.W.3d at 816.

B. *Error in Refusing Appellant's Self-Defense Instruction*

To be entitled to a deadly-force self-defense instruction, Appellant was required to present *some* evidence triggering Section 9.32, "whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). In reviewing the denial of a requested self-defense instruction, we view the evidence in the light most favorable to the requested submission to determine whether evidence from any source will support the elements of the defense. *Id.*; *see also Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013) ("[E]ven a minimum quantity of evidence is sufficient to raise a defense as long as the evidence would support a rational jury finding as to the defense.").

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." PENAL § 9.31(a). A person is justified in using *deadly* force if he would be justified in using force under Section 9.31, and when and to the degree he reasonably believes that the deadly force is immediately necessary to protect himself against another's use or attempted use of unlawful deadly force. *Id.* § 9.32(a). "Deadly force" is "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A "reasonable belief" is "a belief that would be held by an ordinary and prudent man in the same circumstances

31

as the actor." *Id.* § 1.07(a)(42). To justify the submission of the instruction, the evidence does not need to show that the victim was actually using or attempting to use unlawful deadly force, because a person has the right to defend himself from apparent danger as he reasonably apprehends it. *Jordan*, 593 S.W.3d at 343.

The State argues that Appellant's testimony foreclosed any justification defense because he denied both the act and the culpable mental state, thereby failing to satisfy the confession-and-avoidance requirement. "The traditional confession-and-avoidance formulation is that the defendant must admit to 'all elements of the charged offense' to warrant an instruction on a justification defense." *Rodriguez v. State*, 629 S.W.3d 229, 231 (Tex. Crim. App. 2021) (citing *Juarez v. State*, 308 S.W.3d 398, 401–02 (Tex. Crim. App. 2010)). "However, that formulation has been rephrased and even seemingly undermined." *Id.* at 231–32. To that end, the Court of Criminal Appeals has recently reiterated that "[a]dmitting to the conduct does not necessarily mean admitting to every element of the offense," and "[t]he evidence need not unequivocally show that the defendant engaged in the conduct." *Id.*; *Gamino*, 537 S.W.3d at 512–13.

"[A] defendant's testimony explicitly denying a culpable mental state or asserting accident does not automatically foreclose a justification defense if his testimony may otherwise imply a culpable mental state." *Rodriguez*, 629 S.W.3d at 232 (discussing *Martinez v. State*, 775 S.W.2d 645 (Tex. Crim. App. 1989)). Under Texas law, self-defense is available even if a defendant denies the intent to harm. *Id.* at 233; *Sanders v. State*, 632 S.W.2d 346, 346–47 (Tex. Crim. App. [Panel Op.] 1982). For example, in *Alonzo v. State*, the defendant testified that the victim was stabbed during a mortal struggle over a metal spike, but the defendant did not remember striking the victim with it, or even having possession of the weapon. 353 S.W.3d 778, 779 (Tex. Crim. App. 2011). The Court of Criminal Appeals rejected the State's argument that, because the defendant testified that he accidentally killed

32

the victim instead of intentionally killing him, he was not entitled to a self-defense instruction; instead, the court held that, to be entitled to assert self-defense with deadly force, the Penal Code does not require that a defendant must intend for his conduct to result in the death of his attacker. *Id.* at 783 ("From the appellant's testimony, a rational fact-finder could determine that the appellant used deadly force against another when and to the degree he reasonably believed the force was immediately necessary to protect himself against [the victim's] use or attempted use of unlawful deadly force. *That is all that the law requires to raise the issue of self-defense in these circumstances.*" (emphasis added)).

Credibility of the evidence is for the jury to decide; the court's only role is to determine if there is *some* evidence—even if it is weak, inconsistent, or contradictory—that a rational jury could find that supports the defense. *Rodriguez*, 629 S.W.3d at 231 (citing *Juarez*, 308 S.W.3d at 404–05); *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). Any admissions about having injured the victim in response to the victim's aggression "imply the requisite intent even if the defendant otherwise denies it," and "granting the instruction would allow the jury to resolve the conflict in the evidence." *Rodriguez*, 629 S.W.3d at 233. "Consequently, in a case of conflicting evidence and competing inferences, the instruction should be given." *Id.*

Here, Appellant testified that he "put [Trena] on the floor" after she threw a knife at him and threatened to stab him with scissors. According to Appellant, he feared for his safety after she threw the knife and struck him with it, and when she brandished the scissors. He thereafter went to the bathroom to clean his wound and Trena "came in" and was being very aggressive towards him, so he "grabbed [Trena] by the arms, and just tried to lay her down." Appellant admitted to putting his knee on Trena's stomach, and he told her to calm down because "she was jumping, bucking, I guess you could say." Appellant testified that when Trena told him that

she was in pain, he "helped her up." We conclude that Appellant's concession to putting his knee on Trena's stomach "[u]ntil finally she said that she was in pain" constitutes an admission to the conduct that caused her resulting injuries. *See Rodriguez*, 629 S.W.3d at 232–33.

Hence, from Appellant's testimony, a rational jury could have found that by putting his knee on Trena's stomach and holding her down, Appellant's conduct was voluntary, that it caused her to suffer serious bodily injury, and that his culpable mental state at least amounted to recklessness. *See, e.g.*, *Stapp v. State*, No. 06-23-00016-CR, 2023 WL 5424764, at *7 n.15 (Tex. App.—Texarkana Aug. 23, 2023, no pet.) (mem. op., not designated for publication) (the defendant committed an assault by hitting the victim in the face, throwing her to the floor, "put[ting] his knee on her back, and 'grabb[ing] her around the neck.'"); *Vanhowten v. State*, No. 09-22-00119-CR, 2023 WL 2298751, at *2 (Tex. App.—Beaumont Mar. 1, 2023, no pet.) (mem. op., not designated for publication) (the defendant pinned the victim down and held "his knee on top of her throat and back," impeding her normal breathing during the assault); *Fraiser v. State*, No. 11-21-00164-CR, 2022 WL 11406227, at *1 (Tex. App.—Eastland Oct. 20, 2022, no pet.) (mem. op., not designated for publication) (the defendant assaulted the victim by "push[ing] her against the wall and put[ting] his knee on her, causing her pain").

It is undisputed that Trena was unarmed and not using deadly force against Appellant when he used deadly force against her (and her unborn child) during their encounter that ensued after Appellant exited the bathroom, a fact to which the State alluded when opposing Appellant's requested self-defense instruction at trial. And we acknowledge the consensus between us and our sister courts that a defendant who uses deadly force against an unarmed victim is, in most scenarios, not entitled

34

to a self-defense instruction.[7] However, the distinction here is Appellant's allegation that Trena, immediately after throwing an eight-inch knife at Appellant's face and threatening him with scissors, then followed him to the bathroom to "try attacking [him] again." According to Appellant's version of events—which is what we must consider in making this determination—Trena advanced as he retreated to the bathroom, she had just cut him with one deadly weapon (a knife) and brandished another (scissors), and he feared for his safety. *See Gamino*, 537 S.W.3d at 512–513. In light of the standard that we must employ, this constitutes *some* evidence.

After thoughtful consideration and viewing the evidence in the light most favorable to Appellant's requested instruction, we hold that (1) the issue of self-defense was raised by the evidence and (2) Appellant was entitled to the submission of the requested self-defense instruction. *See Rodriguez*, 629 S.W.3d at 231 (citing *Ferrel*, 55 S.W.3d at 591). A trial court errs when it refuses to submit a requested

---

[7]*See, e.g.*, *Rankin v. State*, 617 S.W.3d 169, 183–84 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (the defendant's testimony that she stabbed her unarmed boyfriend immediately after he choked her and let her go did not entitle her to a self-defense instruction); *Lee v. State*, 442 S.W.3d 569, 578 (Tex. App.—San Antonio 2014, no pet.) (the defendant who came to the victim's apartment with a gun and shot the unarmed victim three times was not entitled to an instruction on self-defense); *Dearborn v. State*, 420 S.W.3d 366, 378 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding that the defendant was not entitled to a self-defense instruction where evidence showed that the victim was armed with nothing other than fists and noting blows with one's fists are not typically considered to be the use of deadly force); *Sanchez v. State*, 418 S.W.3d 302, 309–10 (Tex. App.—Fort Worth 2013, pet. ref'd) (holding that the defendant "acted out of anger, not protective instinct," and was thus not entitled to a deadly-force self-defense instruction for shooting an unarmed victim who banged on his car window, but instead was attempting to escape); *Trammell v. State*, 287 S.W.3d 336, 341 (Tex. App.—Fort Worth 2009, no pet.) (the appellant was not entitled to a self-defense instruction in the absence of immediacy of a threat from the victim); *see also Green v. State*, No. 11-21-00254-CR, 2023 WL 5280821, at *2–3 (Tex. App.—Eastland Aug. 17, 2023, no pet.) (mem. op., not designated for publication) (holding that the appellant who shot her unarmed, sexually abusive stepfather was not entitled to a self-defense instruction because the stepfather posed no immediate threat at the time of the shooting); *Wilson v. State*, No. 01-17-00788-CR, 2019 WL 346892, at *3 (Tex. App.—Houston [1st Dist.] Jan. 29, 2019, pet. ref'd) (mem. op., not designated for publication) ("Appellant was not entitled to use deadly force against an unarmed man who had surrendered himself by throwing his hands up and backing away from the conflict."); *Holowatsch v. State*, No. 03-17-00542-CR, 2018 WL 7142179, at *5 (Tex. App.—Austin Jan. 31, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that there was no error in the trial court's refusal to submit a defense-of-third-person instruction because the victim was unarmed, had not attempted to hit the third person with his hands or any other object, nor had he verbally threatened the third person with the use of deadly force).

self-defense instruction when, as in this case, there is *some* evidence that supports its elements. *Id.* Here, refusing to submit the instruction violated the trial court's "duty to look at the evidence in the light most favorable to the requested instruction." *Id.* at 233. Because we have concluded that the trial court erred when it denied Appellant's requested deadly-force self-defense instruction, we must next determine whether this refusal caused Appellant to suffer "some harm." *See Reeves*, 420 S.W.3d at 816.

C. *"Some Harm" Analysis*

A trial court's failure to instruct the jury on a confession-and-avoidance defense "is generally harmful because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013). But when "a record reveals a risk of harm that is so small that it may properly be characterized as not 'remotely significant,' or where the risk of harm is 'almost infinitesimal,' any harm resulting from the error is only theoretical harm." *French v. State*, 563 S.W.3d 228, 239 (Tex. Crim. App. 2018).

"Harm is assessed 'in light of the entire jury charge, the state of the evidence, including the contested issues and weight of [the] probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.'" *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) (quoting *Almanza*, 686 S.W.2d at 171). "In ascertaining whether there is harm, appellate courts 'focus on the evidence and record to determine the likelihood that the jury' would have concluded that the defense applied had it been given the instruction." *Chase v. State*, 418 S.W.3d 296, 301 (Tex. App.—Austin 2013), *aff'd*, 448 S.W.3d 6 (Tex. Crim. App. 2014) (quoting *Wooten*, 400 S.W.3d at 606).

### 1. *The Charge as a Whole*

The first *Almanza* factor requires that we review the trial court's charge in its entirety. Here, the trial court denied Appellant's requested self-defense instruction. As such, the jury was not given the opportunity to consider whether the evidence regarding Appellant's alleged use of deadly force could be legally justified as self-defense, and thus they were not provided the option to acquit him in light of his admissions if they found that he reasonably believed that the use of deadly force was justified. *See Villarreal*, 453 S.W.3d at 433; *Dugar v. State*, 464 S.W.3d 811, 822 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (explaining that when the self-defense "instruction was taken away from the jury, appellant was left without his only defensive theory, making his conviction a virtual inevitability").

When, as in this case, self-defense is the law applicable to the case, the trial court must inform the jury under what circumstances it should acquit a defendant of an offense based on self-defense. *Alcoser*, 663 S.W.3d at 169. Here, there were no such instructions in the charge, nor were there any other instructions that clarified this issue. Accordingly, this factor weighs in favor of a finding that Appellant was harmed by the error.

### 2. *The State of the Evidence*

The second *Almanza* factor focuses on the evidence presented at trial. The evidence, as summarized above, shows that Appellant admitted to using deadly force against Trena that resulted in her being seriously injured and the death of her unborn child. Appellant testified that his conduct was in response to Trena throwing a knife at him (which he claimed struck his forehead), threatening him with scissors, and following him into the bathroom—albeit without a weapon—to attack him. Trena recalled "pulling out the scissors" from the kitchen drawer and holding them out "to keep distance between the two of [them]," but she denied "pull[ing] a knife" on Appellant. Appellant's trial counsel asked Trena during cross-examination whether

37

she "pull[ed] a knife" on Appellant and he questioned her about text messages that she had sent about "help[ing] [Appellant] get his capital murd[e]r charge dropped." In the text messages, Trena tells the recipient that, "to help [Appellant]," she "might have to take a misdemeanor charge . . . for being a crazy psycho and pulling a knife and scissors and throwing s--t and hitting him." With the exception of Appellant's testimony, no other evidence supports his claim that he sustained a cut between his eyes because Trena had thrown a *knife* that struck his forehead. However, Trena's text message that discusses the knife and scissors could have been construed as concocting a story to get Appellant's charges dismissed but it could also have been taken as true, which was a credibility determination for the jury to make. *See Garcia*, 667 S.W.3d at 762.

Indeed, other evidence was presented that Trena did not brandish a knife or attempt to attack Appellant, which, arguably, significantly undermined Appellant's claim of self-defense. But we may not "only look[] at the evidence which undermine[s] the request for the instruction." *Maciel v. State*, 631 S.W.3d 720, 724 (Tex. Crim. App. 2021). Rather, we are required to view the evidence in the light most favorable to the requested instruction. *Id.* at 722. The State argues that the evidence presented establishes that "no rational juror could have possibly found an ordinary and prudent man would have reasonably believed force sufficient to crush a pancreas in half was immediately necessary." The logical thrust of the State's evidentiary assessment is that the trial court could have properly refused to submit Appellant's requested instruction as a matter of law. We have already rejected that assertion by concluding that the jury should have been instructed on, and thus permitted to consider, Appellant's claim of self-defense. This charge error related to a contested issue at trial and Appellant's trial strategy. As such, this factor weighs in favor of a finding that Appellant was harmed by the error.

### 3. *The Arguments of Counsel*

The third *Almanza* factor pertains to the arguments of trial counsel. In considering this factor, we must determine whether any statements made by the State, Appellant's trial counsel, or the trial court exacerbated or ameliorated the complained-of charge error. *Arrington v. State*, 451 S.W.3d 834, 844 (Tex. Crim. App. 2015).

Here, neither the State's nor Appellant's trial counsel's closing arguments focused on justification. Rather, the focal point of their arguments was Trena's credibility, and whether Appellant knew that she was pregnant at the time of the offense. But explicitly arguing a justification defense would have been objectionable on multiple grounds, including an inappropriate request for jury nullification. *See Lumsden v. State*, 564 S.W.3d 858, 900 (Tex. App.—Fort Worth 2018, pet. ref'd) ("Jury nullification is not an argument that a defendant is entitled to make because there is no constitutional right to jury nullification and because there is no constitutional requirement that the jury be instructed on nullification." (citing *Ramos v. State*, 934 S.W.2d 358, 367 (Tex. Crim. App. 1996))). Under these circumstances, we will not penalize Appellant for giving due respect to the trial court's ruling, which essentially required him to abandon any reference to self-defense during closing arguments.

Furthermore, by attacking Trena's credibility and crediting Appellant's, trial counsel was inviting the jury to believe *all* of Appellant's testimony, including his claim of self-defense. We conclude that the arguments of counsel, although they do not weigh in favor of a finding of harm, are, at best, neutral.

### 4. *Other Relevant Information in the Record*

Finally, the fourth *Almanza* "catch-all" factor requires that we consider any other relevant information in the record that would assist in our determination of whether Appellant was harmed as a result of the complained-of charge error.

*Gelinas v. State*, 398 S.W.3d 703, 707 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 171. Above, we have outlined the evidence that is pertinent to our harm analysis. Because there is no other information in the record that would inform our analysis, this factor neither weighs in favor of nor against a finding of harm.

### 5. *The Almanza Factors Considered Together*

"[A] properly preserved error will require reversal as long as the error is not harmless." *Gamino*, 480 S.W.3d at 90. In light of the foregoing considerations and the standard of review that we must employ, we conclude that the omission of Appellant's requested self-defense instruction resulted in some harm to him and constitutes reversible error. Although the jury had to decide which version of events to believe—Trena's or Appellant's—it nonetheless could have convicted Appellant under the charge it received even if it believed Appellant. While reasonable minds may differ, it was for the jury, not the trial court, to decide whether Appellant reasonably believed that his use of deadly force was immediately necessary to protect himself against another's use or attempted use of unlawful deadly force. *See Juarez*, 308 S.W.3d at 404–05.

Appellant admitted to the conduct at issue, and the jury could have found that he acted at least recklessly in causing Trena's serious injuries. Because the trial court refused to submit Appellant's requested self-defense instruction, the jury had no alternative to consider, and thus determine, whether his conduct was justified under the circumstances. *See Cornet*, 417 S.W.3d at 451. Given the evidence in the record that supports Appellant's claim of self-defense, we are persuaded that the jury should have been able to make that determination. *See, e.g., Johnson v. State*, 271 S.W.3d 359, 368–69 (Tex. App.—Beaumont 2008, pet. ref'd) (determining that the defendant was harmed by the absence of the defensive instruction where the defendant admitted that she stabbed the victim "to stop him from jumping on her or hitting her" but the "jury was not instructed to consider" the defensive theory, which

prevented the jury from considering acquitting the defendant "by reason of her immediate need to defend herself"); *VanBrackle v. State*, 179 S.W.3d 708, 717 (Tex. App.—Austin 2005, no pet.) (concluding that the trial "court's refusal to instruct the jury on self-defense caused some harm to appellant" despite significant deficiencies in the defense's evidence); s*ee also Foster v. State*, No. 03-17-00669-CR, 2018 WL 3543482, at *8 (Tex. App.—Austin July 24, 2018, pet. dism'd) (mem. op., not designated for publication).

Because we conclude that Appellant suffered "some harm" by the trial court's refusal to submit the requested self-defense instruction, we sustain Appellant's third issue, reverse his conviction for aggravated assault, and remand that case to the trial court for a new trial.

## VII. *This Court's Ruling*

We affirm in part, and we reverse and remand in part. We affirm the trial court's judgment in trial court cause number A-18-1665-CR. We reverse the trial court's judgment in trial court cause number A-18-1666-CR, and we remand that cause to the trial court for a new trial.


W. STACY TROTTER
JUSTICE


March 21, 2024

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.